COAKLEY, Respondent, vs. PRENTISS-WABERS STOVE COMPANY, Appellant.

*September 20—December 11, 1923.*

*Negligence: Manufactured articles: Gasoline stoves: Defective construction: Liability: Presumed knowledge of manufacturer: Degree of proof: Evidence: Contributory negligence: Questions for jury.*

1. In an action for injuries sustained by the explosion of the gasoline container of a stove, expert testimony that the container cap was merely soldered on is competent, though not enough solder adhered to the container to enable an analysis to be made. p. 98.
2. A manufacturer of gasoline stoves for sale on the open market is bound to know the highly explosive character of gasoline, the general method by which the caps and containers were fastened, and whether such method, uniformly followed in connecting the parts of the containers, was reasonably safe in view of the manner in which the stoves were to be used. p. 104.
3. Plaintiff, using a gasoline stove without knowledge of the manufacturer's method of fastening the caps and containers, was entitled to assume that it was reasonably safe for use with ordinary care, the defects being latent as to her though patent to those familiar with all the details of construction and assembling. p. 105.
4. The evidence in this case is *held* sufficient to justify a finding that the stove, by reason of negligent construction by defend-

Coakley v. Prentiss-Wabers Stove Co. 182 Wis. 94.

ant, was inherently dangerous, and that defendant, as the manufacturer, knew or should have known its defective condition, though there was no direct and explicit proof of such knowledge. p. 105.

5. In determining whether a manufactured appliance defective in its construction is inherently dangerous, the extent and manner of its intended use must be considered; and if such use is dependent on the use of explosive substances that fact is an important consideration. p. 106.

6. The direction of the manufacturer that the stove worked best at twelve to fifteen pounds pressure, and that if the pressure rose to twenty to reduce it, may properly have been considered by the jury as a direction for securing better combustion and not as a warning of danger. p. 106.

APPEAL from a judgment of the circuit court for Columbia county: CHESTER A. FOWLER, Circuit Judge. *Affirmed.*

Action to recover for injuries sustained as the result of the explosion of the gasoline container of a portable gasoline stove.

The complaint set out that defendant was the manufacturer of a certain gasoline stove called the "Auto Kamp Kook Kit;" that it sold one of its stoves to the Yahr & Lange Drug Company, a wholesaler, of Milwaukee; that the wholesaler sold it to M. H. Stuelki, a retailer, of Kilbourn, Wisconsin; and that Stuelki sold the stove to Henry Field, a son-in-law of plaintiff.

It was then alleged that while plaintiff was using the stove at the home of her son-in-law the gasoline container suddenly exploded, covering her with burning gasoline. The particular grounds of negligence alleged were that the stove "was so negligently, carelessly, and unsafely manufactured and constructed by the said *Prentiss-Wabers Stove Company* as to become imminently dangerous to life and limb when used for cooking purposes under pressure;" and that the container was constructed "of an inferior and very low grade material called turn plate;" that the container is attached to the stoves "by unskilled labor and without any adequate test being made of their freedom from defects or of their strength or powers of resistance."

The *Stove Company* denied all allegations of negligence and alleged that any injuries plaintiff may have received were the result of her own negligence.

The type of stove in question was made primarily for camping purposes and outdoor use. The frame of the stove is of steel. It is fitted with two burners, inclosed in a light steel box, a cover of which is closed when the stove is not in use. Attached to the outside of the box on one end is the gasoline container. It holds one quart and is about four inches away from the nearest burner.

The container is cylindrical in form, the cylinder being made by crimping the edges of the metal. Over each end is fitted a cap, the edges overlapping about a quarter of an inch, and solder being used to seal the joint. On the top of the container is the opening through which it is filled. This vent is also arranged so that a small pump may be inserted for the purpose of driving air into the tank. Near the vent is a gauge to register the pressure. The stove was advertised to give best service at from twelve to fifteen pounds pressure.

The explosion of the container and the injuries to plaintiff were undisputed. Shortly after the explosion, the stove, which had been placed on the kitchen range, was thrown into the yard while still in flames by a neighbor. At the trial it appeared that the end of the container toward the front of the stove was not in place. Plaintiff's son-in-law testified that he picked up the stove from the yard the evening of the accident and examined it; that the cap was not on the container; and that it was found in the kitchen by some one.

Plaintiff introduced testimony to prove that there was not a sufficient overlap of the edges of the cap and the body of the container; that the rough edge of this joint was soldered and that the proper method of sealing the joint was by "sweating;" and that the solder used was of the poorest grade. There was further testimony tending to show that

the contents of the container would be warmed by the heat radiating from the burner; and that as the contents were thus heated the pressure would greatly increase.

Plaintiff's daughter testified that a moment before the explosion she saw a blue flame coming from the end of the container.

A great deal of conflicting testimony was given as to whether the joint was soldered or "sweated," and whether the method of fastening the cap was suitable for containers to be used for gasoline on a stove operating under pressure.

In a special verdict the jury found that the cap of the container was not so fastened as to render the stove reasonably safe in view of the use of it contemplated by defendant; that the failure to fasten on the cap in a reasonably safe manner was the proximate cause of the injuries; and that there was no want of care on the part of the plaintiff that proximately contributed to produce her injuries. Damages were assessed at $5,225. Judgment was rendered accordingly.

For the appellant there was a brief by *Goggins, Brazeau & Graves* of Wisconsin Rapids, and oral argument by *Theo. W. Brazeau.*

For the respondent there was a brief by *Cannon, Bancroft & Waldron* of Milwaukee, attorneys, and *D. H. Grady* of Portage, of counsel, and oral argument by *Levi H. Bancroft.*

The following opinion was filed October 16, 1923:

JONES, J. At the trial most of the testimony related to the question whether the method of fastening the cap to the container was the proper method, or whether it was one which should have been known by the defendant to be dangerous in view of the kinds of use to be expected. When the parts of the stove were received from the manufacturer by defendant they were assembled and connected together and skilled mechanics were not employed for that purpose.

There was a large amount of testimony as to the manner in which the cap was soldered to the container. The material used as solder was one-half lead and one-half tin, which has much less tensile strength than the solder composed of copper and zinc ordinarily used for sealing joints in containers under pressure.

There was testimony to the effect that it is not customary or proper to seal the joints of a gasoline container without either sweating, crimping, or riveting. There was evidence on the part of defendant that the joint was sweated, that is, the solder ran beyond the edge of the cap and between the edge of the cap and the container and was not confined to the edge. On the contrary, the testimony of several expert witnesses for the plaintiff was that it was merely a soldered joint. They were competent witnesses although they had made no analysis because there was not enough solder adhering to the container to enable an analysis to be made. Their opinions were based on an examination of the container and the cap in question and the conceded facts.

There was expert testimony tending to show that an ordinary soldered joint with a flange of only a quarter of an inch on the cap is not a safe method for a container of gasoline to be fed to a flame under pressure; that the continued heating and cooling in the ordinary use of the stove would tend to weaken the soldered joint.

Defendant's counsel gave proof that it was its practice to make tests before the stoves were placed on the market to ascertain whether there were any leaks and whether the connections were firm, but it was contended by counsel for plaintiff that the mode of testing was not adequate to determine whether the container was reasonably safe for use in the manner contemplated. The proof for defendant showed that a large number of the stoves had been sold and that but few complaints had been made.   · ·

The stove and the container were shown to the jury and are here as exhibits. They show the close proximity of the

container to one of the burners, and the marks on the cap and the container show that they have been subjected to great heat. We have only given an outline of the testimony and it would seem to serve no useful purpose to set it out in great detail. The case was fairly and ably tried, and the jury found that the cap of the container was not so fastened as to render the stove reasonably safe in view of the use of it contemplated by the defendant, and the trial judge approved the finding.

It will be observed that no question was submitted calling for a direct answer as to whether the defendant had any actual knowledge of the alleged defect. No request was made for any such question by either party and they seemed to acquiesce in the form of the verdict.

It is claimed by counsel for defendant that the failure to allege and prove actual notice of the defect should have prevented a recovery. In his opinion the trial judge thus stated the question involved:

"If to support recovery it must be shown that the defendant actually knew of any defect in the particular tank the weakness of which was found to have caused the explosion, then judgment must go for the defendant notwithstanding the verdict, for there is no evidence to support a finding of any such knowledge. But if the law be that the defendant was bound to know because it ought to know, under duty to the public to put out a reasonably safe article in view of the fuel and use contemplated, the method employed in fastening on the caps and the extent of the overlap, then I think judgment should go for plaintiff upon the verdict."

In support of their claim counsel for defendant cited the following cases: *Bright v. Barnett & Record Co.* 88 Wis. 299, 60 N. W. 418; *Zieman v. Kieckhefer E. M. Co.* 90 Wis. 497, 63 N. W. 1021; *Kerwin v. Chippewa S. M. Co.* 163 Wis. 428, 157 N. W. 1101; *Miller v. Mead-Morrison Co.* 166 Wis. 536, 166 N. W. 315; *Hasbrouck v. Armour & Co.* 139 Wis. 357, 121 N. W. 157. Since the facts in the present case are quite different from those in any case which has

come before the court, it may be proper to briefly review these cases.

In the *Bright Case* a scaffold was made by the defendant which it knew was to be used by the plaintiff and other workmen over a bin seventy feet high. A plank having a large knot broke, resulting in the injury to the plaintiff. This plank had not been inspected or tested before it was used. In the opinion by Mr. Justice ORTON it was held that, notwithstanding the liability of the manufacturer for such defects is in general only to the person with whom he contracts, liability might rest on two well established principles of law: (1) It was held that the case might rest on the implied invitation of the defendant to the plaintiff to use the staging in doing his work and therefore defendant was liable for injury caused by negligence in the construction. (2) It was further held that liability might rest upon the duty which the law imposes on every one to avoid acts imminently dangerous; that

"This liability to third parties is held to exist when the defect is such as to render the construction in itself imminently dangerous, and serious injury to any person using it is a natural and probable consequence of its use." *Bright v. Barnett & Record Co.* 88 Wis. 299, 307, 60 N. W. 418.

In the *Zieman Case* the opinion was by Mr. Justice PINNEY and the case was decided on demurrer to the complaint. The defendant elevator company had placed a freight elevator in the building in which plaintiff was employed, under an agreement that it should not be accepted and paid for until in complete running order, and that in the meantime it should be operated by plaintiff's employer under the supervision and control of the elevator company. While the elevator was thus on trial it fell by reason of a defect in its construction and injured plaintiff, who had nothing to do with its operation but was working near the foot of the shaft.

It was held that the contract by defendant was for a limited purpose and had nothing to do with the business relations of the employer and its servants; that the contract created no privity between plaintiff and defendant, and that there was no invitation to be near the foot of the elevator shaft; that elevators are in such universal use that it could not be said that one in use is *per se* an appliance imminently dangerous, or that serious injury to persons using or being near them would be a natural or probable consequence of such use. The *Bright Case, supra,* was distinguished but not overruled.

The *Hasbrouck Case* also came to the court on appeal from a demurrer to the complaint, and the opinion was by Mr. Justice TIMLIN. The point decided is thus stated in the syllabus:

"An unintentional or negligent dropping of a needle into a mixture from which toilet soap is made is so remote a possibility, such an extraordinary occurrence, and serious injury to the consumer from using such soap for toilet purposes such an unusual and remote consequence of such act, that thereby there is no breach of a duty imposed upon the manufacturer for the protection of the vendee of his vendee, and no actionable negligence is shown." *Hasbrouck v. Armour & Co.* 139 Wis. 357, 358, 121 N. W. 157.

After reviewing other cases and stating the general rule that no duty rests upon the manufacturer and seller to dealers in favor of the purchasers from the latter, with certain specified exceptions, the opinion continues:

"The manufacturer or dealer who puts out, sells, and delivers, without notice to others of its dangerous qualities, an article which invites a certain use, and which article is not inherently dangerous, but which by reason of negligent construction he knows to be imminently dangerous to life or limb, or is manifestly and apparently dangerous when used as it is intended to be used, is liable to any person who suffers an injury therefrom, which injury might have been reasonably anticipated. So a manufacturer or vendor put-

ting out and selling articles inherently dangerous, such as explosives or poisons, without notice to others of their dangerous nature or qualities, or with a misleading notice or negligently in any other way, is liable for any injury to any third person which might have been reasonably foreseen by the manufacturer or dealer in the exercise of ordinary care. So a manufacturer or vendor making and selling an article intended to preserve or affect human life is liable to third persons who sustain injury caused by his negligence in preparing, compounding, labeling, or directing the use of such articles, if such injury to others might have been reasonably foreseen in the exercise of ordinary care. The reason for these rules is apparent. The manufacturer or vendor should have no immunity from duties common to all merely because he is a manufacturer or vendor. At the same time there is in the common law no authority for imposing special duties upon him by reason of any privity between him and the vendee of his vendee, except in the instances mentioned, which may be regarded as occasions of a general duty toward the public to whom the wares are offered, or as exceptions to the rule of nonliability." *Hasbrouck v. Armour & Co.* 139 Wis. 357, 364, 365, 121 N. W. 157.

This has been recognized as a leading case in this state and has been referred to in all succeeding cases on the subject.

The *Kerwin Case* was an appeal from an order sustaining a demurrer to the complaint, and the opinion was by Mr. Justice SIEBECKER. A manufacturer of shoes who had fastened the soles with nails in such a way as to give them the appearance of being sewed was held not liable to one who was thereby induced to purchase the shoes from a retailer and was injured by nails puncturing his foot and causing infection. The opinion quoted from the *Hasbrouck Case, supra.* The rule there stated was applied, and it was held that the allegations of the complaint must be interpreted in their ordinary significance in the light of common knowledge; that a nail used to fasten a shoe sole is not of an inherently dangerous nature; that to say otherwise would be a contradiction of the universal experience of mankind in wearing nail-soled shoes.

In *Galst v. American L. Co.* 165 Wis. 307, 309, 162 N. W. 319, the opinion was by Mr. Justice ROSENBERRY, and it was held that the evidence as a whole tended to establish the fact that there was a change in the condition of the ladder between the time it left the hands of the manufacturer and the time it was used by the plaintiff. Therefore it was said:

"In the view that we take of this case it will not be necessary to discuss the law as to the liability of a manufacturer of a standard article intended for a certain use which is dangerous on account of faulty construction."

Counsel for defendant lay special stress on *Miller v. Mead-Morrison Co., supra,* and the opinion by Mr. Justice KERWIN. The judgment of the circuit court was affirmed by a divided court, one of the Justices not participating and three dissenting. The defendant had built a coal-handling device for a fuel company and it was claimed had been guilty of negligence in respect to the fastening of a guard-rail on a platform of the device. The jury found that the manner of fastening the rail was imminently dangerous to life and limb when used as intended; that the defendant did not have knowledge of this fact; that defendant was negligent in so fastening the rail; and that this negligence was the proximate cause of the injury.

It was held that the answer of the jury as to absence of knowledge was supported by the evidence, as the guard-rail which gave way was quite substantially constructed and fastened and had been subjected to considerable strain and to the weather conditions for twenty months before the injury. It was also held that under the circumstances notice to the defendant could not be imputed, and that the knowledge referred to in the *Hasbrouck Case, supra,* means actual knowledge. In an opinion in a later case Mr. Justice VINJE, in referring to this case, said:

"The defect was a latent one, and it was held not chargeable to the defendant because the case was classed as one where a manufacturer puts out an article having a latent de-

fect for which he is not responsible in the absence of knowl-
edge thereof." *Kashuida v. Adams Exp. Co.* 171 Wis. 25,
27, 176 N. W. 222.

The principle deduced from these former decisions should
be our guide in reaching our conclusion. But the facts in
these cases are so dissimilar to those here presented that it
is doubtful if the decision in any one of them can be re-
garded as decisive in the case before us.

The question of negligence at issue was whether the cap
of the container was so fastened as to render the stove rea-
sonably safe. But in determining this question the evidence
necessarily took quite a wide range, and it became necessary
to investigate the methods of defendant in assembling and
connecting the cap and container. It would probably have
been impossible for the plaintiff to make proof of the negli-
gence alleged in any other way.

It is not a case where an article of manufacture has been
found defective owing to the neglect or mistake of a particu-
lar employee of the manufacturer; a defect not likely to
arise if proper methods have been adopted and which the
manufacturer had no reason to anticipate.

The case was tried on the theory that the general plan
adopted by the defendant of connecting the cap and the
container was one which in the judgment of those skilled
in such matters was faulty and likely to cause danger to
those using the stove and exercising reasonable care. It is
further claimed that although gasoline stoves of the kind in
question may not be necessarily inherently dangerous, they
become so when the cap, and the container holding the gaso-
line, are defectively connected.

It is not too much to say that the defendant knew or was
bound to know the highly explosive character of gasoline.
It seems to cast no improper burden on defendant to hold
that it knew or was bound to know the general method
by which the caps and the containers were fastened and

whether it was a reasonably safe method in view of the manner in which the stoves were intended to be used.

If the testimony of plaintiff's witnesses is to be believed, the method of fastening the cap and the container was a dangerous one in view of the close proximity of the container and the burner. To those who understood and were familiar with this method and its imperfections the danger was manifest. It cannot be said that the danger was manifest to the plaintiff, who had no knowledge of the method used by the manufacturer. As regards her the defects were latent; but to those who were familiar with all the details of construction and assembling they were patent. The plaintiff had the right to assume that the stove was reasonably safe for use with ordinary care on her part.

At the trial a large amount of testimony was given relating to the methods of manufacture and assembling the parts of the stove, the methods of testing and inspecting which were used, the opportunity of defendant to know of the defects claimed and the nature of the defects. The finding of the jury was adverse to the defendant on the question of negligence.

The trial judge held that the question was for the jury and approved the verdict. In a careful opinion he reviewed the Wisconsin cases and came to the conclusion that under the rule stated in the *Hasbrouck Case, supra,* and other cases, the stove, by reason of negligent construction, was imminently dangerous to life and limb when used as intended to be used, and that defendant was chargeable with notice of the defective method it uniformly followed in connecting the parts of the container, and of the dangers which might result to persons using the stove with ordinary care.

We have come to the conclusion that on the testimony the trial judge was justified in holding that the stove as offered to the public was, by reason of the negligent construction, inherently dangerous and that defendant knew or ought to

have known the defective condition of the article it placed on the market for general use. It seems no hardship to the manufacturer of articles of that kind that he should be charged with knowledge of his own methods of manufacturing goods and of the defects in such methods if they exist. But to hold that there must be direct and explicit proof of such knowledge might often defeat highly meritorious claims.

In determining whether a manufactured appliance, defective in its construction, which is to be sold in the open market is inherently dangerous, the extent and manner of its intended use must be considered. If it is one the use of which is dependent upon the use of explosive substances, that is an important matter for consideration, and the tests which would be used in ascertaining whether ordinary manufactured articles are inherently dangerous need not necessarily be applied.

We believe that in sustaining the judgment of the trial court on this subject we are adhering to the general rule adopted by this court in former cases, and there certainly is abundant authority for our view in other jurisdictions. The following are some of the cases which may be cited in its support: *Statler v. George A. Ray M. Co.* 195 N. Y. 478, 88 N. E. 1063; *Devlin v. Smith,* 89 N. Y. 470; *Thornhill v. Carpenter-Morton Co.* 220 Mass. 593, 108 N. E. 474; *MacPherson v. Buick M. Co.* 217 N. Y. 382, 111 N. E. 1050; *Olds M. Works v. Shaffer,* 145 Ky. 616, 140 S. W. 1047, 37 L. R. A. N. s. 560; *Clement v. Crosby & Co.* 148 Mich. 293, 111 N. W. 745; *Holmvick v. Parsons B. C. & F. S. Co.* 98 Minn. 424, 108 N. W. 810; *Berger v. Standard Oil Co.* 126 Ky. 155, 103 S. W. 245.

Defendant's counsel argue that plaintiff was guilty of contributory negligence. The direction given to users of the stove that it worked best at a pressure of between twelve and fifteen pounds, and that if the pressure rose to twenty pounds to reduce it to fifteen, may have been considered as

a direction for securing better combustion rather than a warning of danger. There was no other warning.

Defendant's counsel claim as their theory of the explosion that both burners were lighted and only one was used; that the other flame was not completely turned off and gasoline leaked into the bottom of the stove; that the fumes of the gasoline suddenly ignited from the flame and caused the explosion. But there is little testimony, if any, to support the theory.

The claim is also made that the cap was not thrown off the container in the house but fell off when the stove was thrown out the kitchen door. The only direct testimony on the subject fails to support the view. These were all proper subjects for argument before the jury and we feel bound by the verdict.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, with $25 costs, on December 11, 1923.